Okay, Mr. Vinson, take your time if you need to get your things together. May it please the Court, Counsel, Your Honors, my name is Eric Vinson. I'm here with the General Litigation Division of the State of Texas Attorney General defending the defendants below, Bob Smith and Lawrence Chovanec, who are officials with Texas Tech University. There are three reasons that we have provided in the briefs upon which to reverse the trial court's ruling on the 12b-6 relating to the free speech claim that Dr. Wetherbe has advanced. The first is that the context in which the speech was made was not such that First Amendment protection would normally attach. Insofar, it was within the confines of what is essentially a job interview. The second basis is that the subject matter of the speech was not a clearly established matter of public concern upon which First Amendment protection would necessarily attach for the purposes of the decision makers who are the beneficiaries of qualified immunity. I'm going to focus my arguments, however, today on the third component, which is objective reasonability in light of all of the alleged facts and circumstances. The bottom line here is that Dr. Wetherbe sought two positions of prominence on campus, both of which he, other than his status as a non-tenured professor, he was a very able professor, he was very well regarded, excellent lecturer, significant publications, attributed quite a bit of funding to the university. However, the facts as alleged in the complaint clearly establish that he was not a tenured professor, that he'd made that choice willingly, consistent with his views on tenure, in which he alleges that he is against tenure, particularly at public institutions, for various reasons. And the question before this court is whether an individual in the circumstances, a decision that was either for the deanship or for the horn professorship, would know that applying his status as a non-tenured professor would subject them potentially to personal liability for the exclusion, excuse me, if they exclude him from either of those considerations. Now, to their credit, the plaintiffs have provided an extensive alleged history of their actual amended, third amended complaint, which is the one that we're on, as well as an extraordinary volume of attachments and materials, all of which are presumably intended to tell the tale of an otherwise qualified professor who was denied an opportunity. I don't think they're arguing that they can file a lawsuit because his status of tenure, of lack of tenure, was held against him. They're just saying that that's a factual dispute for the jury, whether it was the status of lack of tenure or whether it was the expression of his views about tenure. I agree with Your Honor's description of what the plaintiff's claim is. The plaintiff's claim has to be that the motivation of the decision makers was his speech and not his status. And here's where the complaint runs into some trouble, because the analysis that the trial court was required to engage in, in which this court is required to apply, is not a reasonable but instead an objective standard. We have cited the cases for Your Honor in our brief, including Brown v. Miller, a case from 2008 in this circuit. The quote is, to be clearly established for purposes of qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. The other quote, and this is the particularly important one. The problem is, when you have a subterfuge, you know you can't fire somebody, let's say, for being in a protected class. So you instead make up some other reason, say, well, they were late to work on Monday, so we'll fire them for that reason. If you're able to establish that it wasn't the being late to work, it was the protected class, you don't like people of a certain race or something, then that can establish a violation. I realize that's a different category. I'm just trying to use an analogy to get away from this point. So here, I don't think on 12b-6 we can decide whether it was status or speech. We have to look at, would it be objectively unreasonable for him to have not promoted this man to dean because of his views? Is that objectively unreasonable to have done that? I thought that was okay, I guess. Sure, and Your Honor touches on a couple things. First of all, the example that you cite, of course, is a Title VII style case where there is a much more expansive analysis factually about the motivations of the actors. And although there are occasionally objective questions asked there, this is a fundamentally different analysis. And Your Honor's point, how can we decide, as this panel, what the real motivation was, is resolved by the Tolan v. Cotton case in 2013, which simply asks us to look at the actors and all the facts in front of the actors and ask, at least possibly, could a reasonable person have made the decision that they made? And if the answer is yes, then they're entitled to qualify. The Supreme Court said that was a fact question. If we're talking about the arrest case that came down earlier this year, I'm not sure it's been cited. The Supreme Court said that we, the Fifth Circuit, made a finding as a matter of law that we shouldn't have made because while there was one reasonable construction of the facts that would go the officer's way, there was another construction of the facts that would have gone the plaintiff's way. So I don't understand how that helps you. Well, Your Honor, I'm not sure that the court went so far as to say that it is not an objective standard at this phase. Yeah, it is an objective standard, but the point is, was it, whose side of the facts do we have to accept before viewing the objective reasonableness? People aren't usually going to confess to wrongful conduct. So then you say, in Toland v. Cotton, the situation of the officer's reaction, was that objectively reasonable? Well, there was a dispute about exactly what had happened, whether the young man had been, you know, sort of fighting with the officers or not, and there was actually a particular act that could have been construed one way or the other. I think he said something about, get your effing hands off my mother, which could have been viewed as a threat or could have just been viewed as a reaction to seeing his mother being allegedly manhandled. So I guess I'm not understanding how this helps you. Well, maybe this is the best version of the argument that I can make, Your Honor, and I'll accept, obviously, your capture of the court's concern with Toland v. Cotton. In that case, there were disputes about facts on the ground that, if resolved one way or the other, would have changed the outcome of the case and could have potentially made the actions not objectively reasonable. Here, we don't have that same degree of dispute. What we have is it is undisputed that he was not tenured, and the argument is that a decision maker, aware of his lack of tenure status, could still be held liable merely because they had known that he had engaged in some form of protected conduct. And insofar as these facts are different, that fact is established by virtue of the plaintiff's pleadings. That gives the decision maker an objectively reasonable basis to make the decision, whereas in the facts of Toland v. Cotton, it sounds like there were some things that needed to be resolved. Here, we don't have that. Why couldn't the State or the University just take the position here that not believing in a tenured system is incompatible at our institution with being the dean of an important department, the structure of which relies heavily on a tenured system? And, Your Honor, we actually touched on that in the original brief. This sort of gets to the Pickering balancing analysis, which we didn't want to put front and center in the argument because it tends to lead to a factual facts and circumstances test. However, even on qualified immunity at the pleading stage under Iqbal and Twombly, that is, do they meet the plausibility standard, I think there is a reasonable argument that the decision makers, faced with the facts in front of them, that we have a candidate who is both non-tenured and avowedly anti-tenured, at least as far as the dean position is concerned. This may not color as much the Horn Professorship award, but the dean professorship certainly, Your Honor is absolutely right, and we have advanced that argument at the very last section of our appellate's brief, arguing that the decision makers, it could not be objectively unreasonable, as a matter of law, and known to the decision makers, that if they were to consider his speech at that step, that it would have been a clear violation of his First Amendment protected rights. Tell us where Garcetti fits in here. You've cited it on several different pages of your brief. Let me find a particular, is there a particular aspect of Garcetti that you're, that you're Well, I'm asking you, because you cited it many times in your brief, starting about page 27 or something like that. Page 26, 29, 31, 36, 37. We're getting more and more Garcetti cases. Well, it's a fairly new decision anyway, but Yeah, this is the public-private aspect of the, this is the context argument that we've advanced, which is essentially Yes, and government speech, too. That's correct, Your Honor. And here, here we have a, we have a spectrum of alleged speech and, and alleged contexts. And, and again, because we're on 12B, ICBAL 12B, we are, we are faced with a plausibility standard. And so, I think in order to, to, to meet that standard, the plaintiffs have to allege not only that he engaged in speech that's a matter of public concern, but he did so in a way that the individual decision makers were aware of. And here, there's no, there's no, if we assume that tenure is a matter of public concern, there's no challenge, there's no doubt that the plaintiffs have alleged that as a general matter, he has been avowedly anti-tenure in, in public or semi-public forums. The challenge in this case is that when the speech actually arose and, and drove the decision makers in this case was in the context of essentially this job interview for the dean position. And in response to a question not about his views on tenure, but instead to what his status as a, you know, what is his tenure status. And he explained, no, I'm not tenured. And then he explained why he's not tenured. And, and although the complaint makes various explanations for that, one of which is clearly not a matter of public concern, that is it gives him more credibility in the business community. He has also generally alleged that he is against tenure because of what it does and what it, how it inhibits universities and their ability to address faculty members that are hard to, hard to get rid of who are low producing. Can you address this issue of, I mean, it seems sort of vague to me, his views about tenure. I thought we were talking about speech. I mean, in other cases we typically have somebody went to the press or somebody went somewhere, the school board meeting, and denounced their boss or their, or some policy at their school or whatever. And then, and then we deal with whether that was part of their job duties and all that and we, we get all balled up in it. But we know what we're talking about. We know what the speech was. Here I'm having trouble outside of the job interview, which I agree with you, does not seem to be the public concern matter. He just says, I gave a lot of speeches throughout my life where I ran around saying I didn't like tenure. Is there anything linking these speeches in the world to any conduct at issue here? That's the part that I'm having trouble with. We, I certainly couldn't find any, Your Honor. I, I, I went through because there, again, there are, there are general allegations of being in the world and being against tenure and speaking about it. But the, the, the cited publications allegedly showing his, his avowed views on tenure all arose after the filing of this lawsuit. And so, I agree with you, Your Honor, there is a causal problem in here in terms of connecting the dots. I, I agree with that. Your Honor. The university operating procedure, am I correct that it was revised to preclude being a dean or et cetera without tenure, but it was revised after Weatherby did, did not receive this position? I know for certain that the, that the Horne professorship procedures were clarified to make sure tenure was. And that at the time that Dr. Weatherby applied, there was no express prohibition for non-tenured faculty for either position. That, that, that is a true state of facts. The question is, again, was it, would no reasonable person. What was the reason that the President's office pulled Weatherby from being considered for the Horne position back in February of 2012? Well, again, on the. Is that the record? As the, as the plaintiffs have alleged, every statement by every Texas Tech University member has been because, primarily because of his status as non-tenured. The plaintiffs allege that that is essentially a subterfuge as Judge Haynes has identified for retaliating against his views. The, the specific mechanical sequence was that Dr. Smith was under the impression the whole time that Dr. Weatherby was, in fact, tenured. Because at the time Dr. Weatherby was hired, Dr. Smith was not a part of that. And when he discovered that Dr. Weatherby was not, in fact, tenured, Dr. Smith, and he owns this, he, he took Dr. Weatherby specifically out of contention, both for the dean position and for the. I understand, but as I understand it, the President's office, not Dr. Smith, pulled from the agenda in February 2012 Dr. Weatherby being considered for the Horne professorship. I'm just curious as to why that occurred, if that's in the record. I, I don't know for certain whether that component is, is identified in the record. I believe they're actually in some of the attachments. There's some discussion of that issue. There's, there are full depositions that are attached, as well as the hearing transcripts. And I, and I think the explanation was, again, Dr. Smith identifying that he, it became a fact that he learned of Dr. Weatherby's status as non-tenured and, and essentially reversed himself on both of Dr. Weatherby's applications for, for these positions. All right. You've saved time for rebuttal. Williams. May it please the Court. Counsel. Holly Williams on behalf of plaintiff appellee Dr. James C. Weatherby. To address a couple of the issues that were raised by the judges, yes, Judge Barksdale is correct that the O.P. was revised after the suit. And the defendants have admitted in their answer that the O.P. at the time, the Horn O.P. did not specifically require tenure. And O.P. you're referring to operating procedure? Yes, sir. Operating procedure. I believe it's 32.09. As far as your question about why the President yanked the agenda item, as you know, we're here on a 12B6 motion. We have not had the opportunity to conduct any discovery in this case because a stay was imposed. I've seen cases alleging where qualified immunity was an issue where at least some discovery was allowed on the issue of qualified immunity. That has not been the case here. But you have a whole lot of stuff. I mean, you've got, I think, A through Z literally attached to your complaint. So I don't know that you've really been deprived of a bunch of evidence. You gathered it elsewhere. Yes, Your Honor. We have done the best we could under the circumstances. A lot of the evidence candidly came through the grievance process. And to address Judge Haynes, your question about the link, what is the link between his speech as tenure and the conduct of the defendants and particularly Provost Smith? And the link is Provost Smith's statement in the grievance hearing relating to the Horn professorship. Provost Smith said, tenure is not something we want to lose, particularly in the political times we are in now. So we believe it is plausible, based on this statement during the grievance proceeding, that Provost Smith acted against Dr. Weatherby based on the expression of his views that were anti-tenure. Now, I think it's important to... I don't understand what's wrong with that. Are you saying that it's never appropriate to deny someone a position such as this, an important dean's position in a department? It's never appropriate to deny someone that kind of position because of his or her views or opinions on a particular topic? Your Honor, one thing I would point out is that although Dr. Weatherby himself declined tenure and has spoken out against tenure, he has also participated in the tenure process by providing recommendations. While he advocates for change, he has never said that he would not comply with the university's policies relating to tenure. I do believe there is an exception for high policy ranking officials within their job duties, but his expressions are outside of his job duties, which bring us to the Garcetti analysis. Okay, well let's... I mean, let me just... I'm just sort of asking a broad hypothetical question, but to me it's significant. Let's just say hypothetically that you had an environmental science department and you're interviewing someone for the deanship. Could that position be denied that applicant on the basis of his or her views, let's say, about climate change or global warming? We disagree with your view on that, therefore you can't be our dean, or is that prohibited of a public university? I would say, Your Honor, that that would be a violation of the candidate's or the dean's right to free speech. If he had expressed those opinions outside of the university context, then yes, that would be a violation. See, that gets us back to my question about views versus speech. I don't really understand this vague concept, his views make him unfit, as necessarily even stating a cause of action for First Amendment retaliation, because I thought there has to be some particular speech that occurred and then we can analyze whether it was in the course of his duties or outside, matter of public concern and all that. This thing about his views, we just don't like your views, while I may or may not agree with withholding somebody's views against them, how does that match up with this cause of action for First Amendment retaliation when we don't even have a speech, not one particular speech anywhere alleged that he could be retaliated against for? Well, there is not one particular speech alleged because Dr. Weatherby has made speeches over a 20-year period. He actually held tenure at two different universities, resigned it at one, declined it in another where it was offered, and declined it at Texas Tech when he was brought on at Texas Tech. There is nothing whatsoever to show that Dr. Smith ever heard or saw any of these speeches that occurred outside the context, as you say, of the university with his expression of views during the dean's interview and just in general, but these outside speeches to business groups or whatever, there's no indication Smith even knew anything about those. So how can we say that you've alleged a claim for First Amendment retaliation at all without any—I mean, honestly, I've seen several of these and they all involve something somebody said somewhere we know about. They showed up at a school board meeting or they went to the press or they did this or they wrote a letter to the editor or, you know, whatever. Where is that here? Well, in paragraph 25 of the complaint, it's alleged that Defendant Smith testified that he was not exactly sure when he became aware of Weatherby's views on tenure, but clearly it came out during the course of looking at him as a potential candidate to be a Horn professor. He also testified that it came out in Weatherby's application to become dean in his off-campus interview. There is nothing there that shows that Smith ever heard or knew about any of these speeches that occurred in the public arena, shall we say, outside this process of the internal job-related stuff like his interview and his application for the Horn professorship. He might have already known it. It doesn't tell us he heard any speech anywhere that could arguably fall within your public concern, you know, outside the job area. Well, Your Honor, whether or not he learned about it in the context of the interview is not the protected activity. The protected activity is his speech outside of the university environment. Your Honor, you haven't shown Smith, you haven't alleged that Smith knew any of these speeches, any particular speech that took place that wouldn't be part of the internal job, you know, I'm applying for a job and that's a matter of personal concern. I think that's pretty clear. So this matter of public concern is giving these speeches to business groups. That's your argument. That's what you have to rest on. You haven't alleged a link between that. Despite having 25 exhibits and pages and pages of stuff and all of this, that's not in there. This is the best you can do is that maybe Smith knew his views on it. Well, Your Honor, with all due respect, this is a 12B6 motion. All the facts are to be viewed in the light most favorable to the plaintiff. Again, we've had no discovery. We do have and have alleged and have support that Dr. Smith admitted that he knew about Weatherby's views on tenure. So we haven't had the opportunity to depose him and find out. How did you get the Q&As that are in the complaint? Because there is numerous Q&As listed in the complaint from Dr. Smith. There was a one-hour deposition of Provost Smith that was in a state court action. Okay, so you have had discovery. Were you there at the deposition? I was, but I was not allowed to ask any questions. Okay. Did anybody ask him about when he learned of these views? Yes. This Q&A. This Q&A just does not tell me that there is. Let me come at it this way. Why do you think Smith has heard these speeches that Weatherby's given? I don't think it's critical that Smith hear the actual speeches as long as he knows that Weatherby has made the speeches. What makes you think that Smith knew that Weatherby made these speeches to business groups and so forth, that he knew that at the time that he made these decisions about Dean and Horn Professor and all that? Because it is alleged in the complaint that Smith actually described his understanding of Weatherby's views and the fact that he told business leaders that he appreciated the fact that Dr. Weatherby declined tenure. In the course of Dr. Weatherby's speeches, he's talked about tenure as an obstacle to change, and he's had the experience where someone said to him, Well, that's easy for you to say. You have tenure. And he said, No, I don't have tenure, and has been applauded for that position. Now, the reason he's applauded is because tenure is a matter of debate in our society right now. It is clearly a matter of public concern. And I would say I would draw the analogy to the Charles v. Grief case, which the district court relied heavily on in its opinion. That's a case in which a lottery official sent e-mails to members of the legislature complaining about discrimination and misconduct. And there was actually a meeting with his supervisor where he was questioned about those e-mails. And I would draw the analogy to that situation that the supervisors didn't have to be the recipient or actually witness the e-mails. The e-mails and Dr. Weatherby's speech are the protected activity. The fact that the decision-maker learns about it during the course of an interview about an entirely different issue doesn't mean that it relates only to his job duties. So let's get back to the question I asked you a little while ago. Let's say that you have a law school and you have an opening for the deanship, and you have a law professor from some other part of the country who's made lots of speeches and written lots of articles to the effect that states shouldn't have bar exams or shouldn't license lawyers, that that shouldn't be a requirement for the legal profession, that anyone ought to just be able to hang out a shingle. And that person applies for the deanship at a particular law school. Are you telling me that the law school can't look him or her in the eye and say, you know what, it's just incompatible with our mission as a law school to have a dean who doesn't believe in licensing of attorneys? Your Honor, I think it would have to depend on the circumstances. And one key fact that has not been mentioned is that Dean Alan McGinnis, who is the dean of the Rawls College of Business, was not tenured. So this leads us to the point about whether Smith's conduct was objectively reasonable. What about my hypothetical? I know lawyers don't like hypotheticals, but I just gave you one that I think is fair to test your position on whether a person can be excluded from a deanship because of that person's views on something having to do with that particular subject matter. I think based on that hypothetical, that may be a legitimate decision, but it would have to depend on the facts and circumstances. Well, isn't this where we, and Judge Smith's hypothetical is a good example, isn't this where we've got to keep the focus on what we're here about, and that's the denial of qualified immunity, which deals only with Provost Smith's individual liability. Now, that doesn't mean that Weatherby can't win against the university, or vis-a-vis a claim against Smith when it's back being tried on the liability of the institution, but with qualified immunity, we make an objective decision, not a subjective decision, and not having tenure and not being a head of a department or holding a prestigious professorship is not objectively unreasonable. Your Honor, I would submit that there are facts that make it plausible that it is not objectively reasonable under the circumstances. With respect to the Horn, again, there's the point that the Horn OP itself did not explicitly require tenure. Provost Smith actually went back to the Horn committee who recommended Dr. Weatherby and told them, he doesn't have tenure, I think you should reconsider your decision, and the Horn committee said, we still want to put his nomination forward. We went through the faculty grievance process. He went back and said he doesn't have tenure. He didn't go back and say he has spoken against tenure. He simply said he does not have tenure, black and white. He either does or he doesn't. He doesn't have it. But, again, this goes back to the possibility of pretext that Judge Haynes raised earlier. If the reason, if he's using the absence of tenure as an excuse to get rid of him because of his views on tenure, then we think that is a fact question. I might go to a liability on an official basis against the institution through Smith, but possibly not on individual liability on a qualified immunity, which is what we're dealing with. Is Dr. Weatherby still at Tech? Yes, Your Honor, he is. They didn't get rid of him? Not yet, but they're continuing a pattern of, you know, we could tend, that's why there are three amended complaints because there kept being additional information to incorporate. And on the point about nothing being in the record prior to the filing of the lawsuit, since the lawsuit has been filed, Dr. Weatherby has been invited to do opinion pieces in the Harvard Business Review, the Huffington Post, the Financial Times. And so those things were clearly in the public domain at the point where some of these, for example, when he was removed as associate dean, which was added in the third amended complaint. So despite his views being in the public domain, the university has continued to carry out discrimination against him. But also on the dean, on the point of Is there concern about not having Smith available for individual liability as opposed to in its official capacity? I'm sorry, would you repeat the question? Well, all we're talking about here is Provost Smith's individual liability, paying out of his own pocket as opposed to being liable in his official capacity, which the university or the state or someone would have to pay if there were damages. I just don't see your concern about, not that it has anything to do with whether you're right or wrong, but the concern about his individual liability. Your Honor, it's my understanding that the appellant's position is that if they're entitled to qualified immunity, he would not be entitled to, he would not be liable in his official capacity either. I've heard that. Well, if I may go quickly to the issue of the dean, I do want to point out a couple of issues here. Again, Dean McGinnis himself was not tenured, so that certainly suggests that tenure is not required in order to be dean. The announcement that was posted for the position of dean did not require tenure. The provost put the tenure question on the interview list, especially for Dr. Weatherby. The search committee heard Dr. Weatherby's discussion about his views on tenure, and the search committee still ranked him in the top four. All of these are facts from which we believe it's plausible to. . . Can I ask you about the public concern? I just wonder, this whole tenure issue, frankly, I hadn't realized was a controversy at all until that California decision that banned tenure or something recently. So I'm wondering, you know, now it seems like tenure is a big deal. I can understand your argument now, but two or three years ago, I'm not sure I would have known that it was a matter of public concern if, in fact, it is. So can that be something that changes over time, like the climate change example? We weren't talking about climate change however many years ago. Now, all of a sudden, it's all the rage. Can that evolve over time, whether something's a public concern? Yes, Your Honor, I think it can, but I would submit that tenure, at least in academic circles, has been an issue over particularly, I would say, the last five or ten years. But public concern isn't just whether a bunch of professors care about whether they can keep their job or not. Public concern is whether the public as a whole is interested in this. Is this a matter that the public as a group, not two or three members of it who happen to work at universities, is concerned about? And I think this California case has maybe drawn attention to it. Does that make it a public concern at the time of the events in question, and particularly when we're looking at a qualified immunity issue about whether it's clearly established that that would be a matter of public concern? Yes. There was actually a cover story in Texas Monthly, I believe in August of 2012, about, I would say, differences of opinion in particular in the UT and A&M systems. The governor has actually promoted in some think tanks that he is associated with, have promoted the idea of the $10,000 degree that you may have heard of, and actually in public policy circles, the issue of whether tenure is appropriate and what cost it has to the taxpayers has been a matter of public concern, and I think that's demonstrated by the Texas Monthly article and also the Wall Street Journal article that is referenced in the complaint, which I believe was a counterpoint about tenure, and I believe it was in late 2011. It certainly predated our lawsuit, and I see I'm running out of time. I respectfully urge that a 12B6 motion, which is what we're here today, the district court's opinion should be affirmed. Thank you, Ms. Williams. Thank you. Mr. Vinson, you save time for rebuttal. Mr. Vinson, is it your opinion that if Smith is not held individually liable, he cannot be held liable in his official capacity? That is not my position, Your Honor. There is a point, however, about damages, which is typically official capacity defendants in their official capacities, there's injunctive relief that can be obtained on a constitutional claim under 1983 but not damages, so that would change the character of the case if all the official individual capacity defendants were ultimately dismissed from the case. That, to me, is the reason that's the motivation to hold on to these defendants. Briefly, I want to pick up on Your Honor's point, Judge Haynes, about whether tenure, the subject of tenure, is a clearly established matter of public concern, and I don't think any court has ever held that a single Wall Street Journal article discussing the subject makes it a clearly established matter of public concern. The plaintiff has been unable to cite any other authority that would even be analogous to put these individuals on notice that if they were to use his allegedly protected speech, assuming whatever that may be, as a motivating factor to deny him either the deanship or the professorship, that that would be a clearly established matter of public concern for which they might enjoy the benefits of personal liability. I guess, hearkening back to Judge Smith's analysis or analogy about sort of the vision of somebody you want as your dean, I think it's a fair point that if we're an academic institution, we want people who say going to school, going to law school is important. I believe in going to law school and espousing that view. I don't think that's really that controversial. I guess I wonder how far you can take that because it seems like you could start to say, well, we only want people who espouse this or that political view or this or that. We don't want people who upset our donors by going around and taking positions on hot issues of the day, and then we start to really get – so how far can we go with the vision versus viewpoint analysis? Well, I think on a 12B, the answer, honestly, is you probably can't go very far. However, this is one of those cases where you don't have to go very far to get there. We are talking about not only the fact that it's one thing to not have tenure. It's another thing to be avowedly anti-tenure, as your Honor's hypothetical drove at. Again, and then on the qualified immunity analysis, is it objectively reasonable to insist on that as a matter of law? And, of course, the answer is yes. It is absolutely appropriate for someone in the position of Dr. Smith or anyone on any committee reviewing these applications, particularly for the deanship, to consider somebody's views on tenure as being antithetical to the role that they're being asked to play. And this, again, goes very much in line with Judge Smith's hypothetical. So yes, I agree with your Honor that the court does need to be cautious about how far it treads on 12B, but I do think this is a clear case where you can safely, without creating a bunch of gray areas that twist parties and lower courts in knots, by saying simply, tenure is so closely in line with the clear intent and core of what an academic institution stands for, that it would be safe to do so here without creating a panoply of difficulties for resulting courts. If there are no other questions, I'll yield my time to the bench. Thank you all. We ask the court to reverse the denial of qualified immunities for these individuals. Thank you. Your case and all of today's cases are under submission.